1

2

3

4

5                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
6                                    AT SEATTLE

7

8    BLAIR ROWLEY, as Personal                 Case No. C08-1311 MJP
     Representative of the ESTATE OF
9    CHRISTOPHER ROWLEY, Deceased,

                        Plaintiff,             ORDER ON SUMMARY JUDGMENT
10
            v.
11
     USAA LIFE INSURANCE
12   COMPANY,

13                      Defendant.

14

15          This matter comes before the Court on Defendant USAA Life Insurance Company's

16   motion for summary judgment. (Dkt. No. 24.) Having reviewed the motion, Plaintiff's

17   response (Dkt. No. 29), USAA's reply (Dkt. No. 39), and all papers submitted in support

18   thereof, the Court DENIES USAA's motion. The Court also DENIES Plaintiff's motion to

19   strike Michael Patterson's testimony.

20                                       Background

21          In 2005, Christopher Rowley ("Plaintiff") obtained a life insurance policy valued at

22   $500,000 from USAA Life Insurance Company ("USAA"), prior to his death in June 2006.

23   USAA contested Plaintiff's estate's claim for benefits, and denied policy benefits on the basis

24   that Plaintiff made false statements and concealed materially adverse information about his

25   health from USAA. Plaintiff's estate filed suit against USAA for breach of contract,

1  negligent claims handling, bad faith, violating the Washington Consumer Protection Act, and

2  violating the Washington Insurance Fair Conduct Act.  (Dkt. No. 2 at 9.)

3      Plaintiff applied three times for life insurance with USAA.  In 2000, Plaintiff

4  contacted USAA, but did not obtain life insurance.  (Wilner Decl. Ex. J at 4-5.)  USAA

5  created a "risk profile" for him, but no documentation explains why the policy was not

6  obtained.  (Id.)  On July 15, 2004, Plaintiff again contacted USAA and expressed an interest

7  in obtaining life insurance.  (Id. at 6.)  USAA created a new "risk profile" for Plaintiff and

8  entered in a note on July 15, 2004, that Plaintiff took "meds for upper back pains/as needed."

9  (Wilner Decl. Ex. K at 1.)  As part of this application, Plaintiff filled out a form Medical

10  Health Questionnaire ("MHQ") with the assistance of Ralph Franklin on August 23, 2004.

11  Plaintiff disclosed that he had seen Dr. "Ronald King" for at least one year for "pain in [his]

12  neck" and that he was given a "muscle relaxer Cycobenzophine."[1]  (Wackerbarth Decl. Ex. C

13  at 1.)  Plaintiff answered affirmatively that he had a "disorder of the back or spine muscles or

14  bones."  (Id.)  The word "muscles" is circled on the form.  (Id.)  Elaborating on this

15  disclosure, Plaintiff stated that his neck pain was "stress related" and that he was "followed by

16  Dr. King."  (Id. at 2.)  Plaintiff reported that "[t]his is a disorder that has been on/off for @

17  least 5 yr," that he was taking a muscle relaxer, and that treatment was ongoing.  (Id.)

18      In the 2004 MHQ, Plaintiff also answered "no" to whether he had "[a]ny other mental

19  or physical condition not listed."  (Id.)  He also answered "no" to the question of whether he

20  had been "advised to have any diagnostic test, hospitalization, or surgery which was not

21  completed."  (Id.)  He answered "no" to a question of whether he took any narcotics without a

22  physician's advice, having any injury or illness, and having any diagnostic tests.  (Id.)

23  Although Plaintiff filled out the MHQ, he never completed his 2004 application for life

24  insurance.

25

---

[1] This appears to be a misspelling of cyclobenzaprine, given that there is no drug called cycobenzaphine.
Moreover, Dr. King was likely a misspelling of Dr. Ronald Kane, Plaintiff's physician.

On January 24, 2005, Plaintiff successfully applied for a life insurance policy from USAA, and the policy became effective on October 3, 2005. (Blair Rowley Decl. Ex. A at 3, 17.) On August 2, 2005, Plaintiff filled out another MHQ, this time with the aid of Elda Pascual, an employee of American Para Professional Services. (Pascual Dep. at 32.) In the MHQ, Plaintiff stated that he had seen Dr. Ronald Kane in 2004 for migraine headaches and was prescribed Maxalt. (Wackerbarth Decl. Ex. E at 1.) Plaintiff answered "yes" to whether he had ever been "treated for or consulted with a heath advisor for . . . [a]rthritis, gout, or disorder of the back or spine, muscles or bones." (Id.) In elaborating on this response, Plaintiff stated that he had a bunionectomy in 1997 and was fully recovered. (Id. at 3.) Plaintiff also disclosed that he had a history of migraine headaches. (Id.) He answered "yes" to whether he was "now under regular observation, receiving treatment or taking medication," stating that as of July 27, 2005 he was taking Amoxicillin for a mucocele inside of his mouth in anticipation of a surgical procedure to be performed on August 3, 2005 by Dr. Jonov. (Id. at 2.) He also answered affirmatively that within the past five years he had "[b]een advised to have any diagnostic test, hospitalization, or surgery which was not completed." (Id.) He explained that this was related to the mucocele procedure, for which he was taking "HC-Ibuprofen 7.5mg." (Id.)

Plaintiff was again asked whether he had been "treated for depression or anxiety, or other mental disorder." (Wackerbarth Decl. Ex. E at 1.) He was also asked whether he had "ever used any intravenous drugs, narcotics, barbiturates, excitant drugs, marijuana, hallucinogens, or tranquilizers unless on the advice of a physician." (Id.) The MHQ asked further whether he had "an electrocardiogram, X-ray, or other diagnostic test." (Id.) It also asked whether he had "had a checkup, consultation, illness, injury or operation" in the last five years." (Id.) Plaintiff answered "no" to all of these questions.

The 2004 MHQ was not presented to Ms. Pascual at the time she administered the 2005 MHQ. However, an internal record from USAA shows that the information was

1    retained by USAA and was part of the "risk profile" it created for Plaintiff.  An entry dated

2    July 12, 2005, from Claire Chapman, a USAA employee, notes in Plaintiff's risk profile that

3    Plaintiff had "meds for upper back pains/as needed."  (Wilner Decl. Ex. K at 2.)  Plaintiff's

4    father also testifies that the policy he found in his son's records contains the 2004 MHQ as

5    part of the bound policy issued by USAA.  (Blair Rowley Decl. ¶ 3.)  Having reviewed this

6    evidence and construing it in favor of Plaintiff, the Court finds that USAA had the 2004

7    disclosures were part of the policy issued in 2005.

8           In September 2005, Plaintiff contacted Sandra Osborne, an employee of Insulink

9    Services, to follow up on disclosures he made to USAA.  Plaintiff explained that he was

10   calling because he applied for insurance and that USAA "had a migraine headache question."

11   (Lucien Decl. Ex. A at 2.)  Plaintiff disclosed that he "had some back pain."  (Id. at 3.)  Ms.

12   Osborne then asked a compound question "referencing the back and neck condition."  (Id. at

13   4.)  Plaintiff stated that he had middle back pains that occurred when he was 14 or 15 years

14   old, due to playing football in high school.  (Id. at 4-5.)  He reported that his last symptom

15   was in 1982 and that this condition did not affect any job duties, daily or leisure activities.

16   (Id. at 5.)  He stated further that his most recent doctor visit in relation to this condition was in

17   1982, where only hands-on diagnostics were used.  (Id. at 7.)  Ms. Osborne never followed up

18   on questions about his neck pain.

19          Plaintiff died on June 2, 2006 of a hypertensive crisis and a right adrenal

20   pheochromocytoma—a large adrenal gland tumor.  (Wackerbarth Decl. Ex. L at 1.)  Doctor

21   Howard Miller, Plaintiff's expert, explained that the tumor was "huge" and "rare" and that it

22   was never diagnosed prior to death.  (Miller Dep. at 34, 37.) The death certificate states that

23   an "[a]cute intoxication due to the combined effects of methamphetamine, cocaine,

24   methadone, hydrocodone, and cyclobenzaprine" also contributed to Plaintiff's death  (Id.)

25   The death certificate lists "how injury occurred" as "Substance abuse."  (Id.)

USAA denied Plaintiff's estate's claim for benefits, invoking its right to contest whether Plaintiff misrepresented his health in applying for the policy. USAA stated that:

> If Mr. Rowley's history of cervical and lumbar disc disease, history of depression, and substance use (methadone, recreational cocaine and marijuana use), had been fully, truthfully and accurately provided to us, we would not issued [sic] the life insurance policy to Mr. Rowley.

(Wilner Decl. Ex. E at 3.) USAA has moved for summary judgment, arguing that the evidence supports a finding that Plaintiff knowingly misrepresented his medical condition with an intent to deceive and that this materially affected USAA's assumption of risk.

**Discussion**

A.    Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Genuine issues of material fact are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Because a mere scintilla of evidence is insufficient to create a factual dispute, the non-moving party must set forth specific facts demonstrating a genuine issue of fact for trial. Id. at 252. In ruling on summary judgment, the court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." Crane v. Conoco, Inc., 41 F.3d 547, 549 (9th Cir. 1994).

B.    Contestability Standard

Under RCW 48.18.090(2), the falsity of any statement by the insured "shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer." To succeed on its motion, USAA must demonstrate that Plaintiff: (1) made a

1    false statement, (2) and that the statement (a) was made with an intent to deceive or (b)

2    materially affected the acceptance of the risk or hazard USAA assumed.  RCW 48.18.090(2).

3         Proof that a material false statement was made knowingly raises the presumption that

4    it was made with the intent to deceive.  See Music v. United Ins. Co. of Am., 59 Wn.2d 765,

5    769 (1962).  Plaintiff must provide some credible evidence that the false representations were

6    not made with the intent to deceive to overcome this presumption.  See Kay v. Occidental

7    Life Ins. Co., 28 Wn.2d 300, 301 (1947).  A mere denial is not sufficient.  Am. Fidelity &

8    Cas. Co. v. Backstrom, 47 Wn.2d 77, 84 (1955).

9    C.    Contestability

10        USAA denied coverage for three reasons: the failure to disclose (1) cervical and

11   lumbar degeneration, (2) a history of depression, and (3) illegal narcotic use.  (See Wilner

12   Decl. Ex. D at 22-23.)  Plaintiff provides credible evidence that he disclosed his back and

13   neck condition, had no history of depression, used marijuana and methadone with a

14   physician's prescription, and had no history of cocaine use.  Disputed issues of material fact

15   on all three issues bar summary judgment.

16        1.    Cervical and Lumbar Degeneration

17        USAA contends that Plaintiff knowingly concealed his history of ongoing and chronic

18   neck and back pain and his related pharmaceutical treatment, surgery recommendation, and

19   diagnostic tests.  (Dkt. No. 24 at 17); see Music, 59 Wn.2d at 769.  Plaintiff's medical records

20   show a substantial amount of treatment for his back and neck conditions that he did not

21   disclose to USAA.  Whether his failure to disclose this was done with an intent to deceive or

22   whether it materially affected USAA's assumption of risk raises questions for the jury.

23        USAA submits evidence showing that Plaintiff suffered from cervical and lumbar disc

24   degeneration and had other treatments not disclosed to USAA.  In the middle of 2000,

25   Plaintiff's physician, Dr. Kane, assessed that Plaintiff had "[c]ervical muscular strain with

     stress as a contributing factor," for which he gave Plaintiff a referral to a massage therapist.

(Kane Dep. at 24.)  Dr. Kane also prescribed Effexor for the pain.  This largely accords with Plaintiff's disclosure to USAA.  However, Plaintiff also had an MRI of his lower back performed on January 2, 2002, from which Dr. Kane assessed that Plaintiff had mild lumbar disk disease and cervical disk disease.  (Id. at 42.)  Plaintiff also received two epidural injections related to his neck pain in 2002.  (Dr. Vladimir Fiks Dep. at 33.)  In 2002, he was also prescribed Bextra, a non-steroidal anti-inflammatory drug.  (Id. at 35.)  This information was not disclosed to USAA.

Plaintiff did not disclose that he had further MRI studies performed and that he received a recommendation for surgery.  On Dr. Kane's referral, Plaintiff saw Dr. Jeffrey Garr, an orthopedic surgeon specializing in spine surgery.  (Garr Dep. at 4-5.)  Dr. Garr saw Plaintiff twice, on June 24 and August 5, 2003.  Dr. Garr examined Plaintiff and found his cervical range of motion limited in all planes and that his arm pain "was coming from his neck rather than his arm."  (Id. at 8-9.)  Dr. Garr took x-rays on June 24, 2003, which revealed "[s]light degenerative changes . . . at C5-6."  (Id. at 9.)  Dr. Garr also obtained an MRI of Plaintiff on June 25, 2003, which showed "left C5-6 and C6-7 stenosis and compression of both C6 and C7."  (Id. at 11.)  Dr. Garr recommended that Plaintiff undergo a surgical procedure to fuse part of his spine.  (Id.)

Plaintiff was also prescribed methadone and had nerve studies conducted, which he did not disclose to USAA.  On March 21, 2005, Plaintiff saw Dr. Natlia Tishkevich, a rheumatologist. (Wackerbarth Decl. Ex. S at 1.)  He presented with a "history of chronic neck pain, for which he is on methadone."  (Id.)  He reported "thoracic spine pain for which he has been seeing a chiropractor."  (Id.)  He also stated that he started developing neck pain in 1998, for which he had EMG and nerve conduction velocity studies done.  (Id.)  He described having taken OxyContin in 2000 without positive response and that he had been taking methadone daily on the advice of Dr. Brown for 4 years.  (Id. at 2.)  Dr. Tischkevich noted his past medical history included chronic neck pain and narcotic use.  (Id.)  Dr. Tichkevich

recommended that Plaintiff "proceed with neurologic evaluation by obtaining EMG, nerve conduction velocity studies to evaluate for the presence of neuropathy." (Id. at 3.)

USAA argues that Plaintiff's failure to disclose the full extent of his degenerative disc condition shows that he knowingly made false statement with a presumed intent to deceive. (Dkt. No. 24 at 15-18.) However, in 2004 Plaintiff disclosed to USAA that he had been suffering from a neck condition for five years, that he was taking cyclobenzaprine, and that he was being followed by Dr. Kane for continuing treatment. (Wackerbarth Decl. Ex. E at 1-2.) At the time USAA issued Plaintiff the policy, USAA's risk profile for Plaintiff showed that Plaintiff was using "meds for upper back pains/as needed." (Wilner Decl. Ex. K at 2.) That Plaintiff made no mention of his neck condition in the 2005 MHQ does not show unequivocally that he knowingly made a false statement. Rather, as Plaintiff has argued, he already disclosed this condition to USAA, which formed a part of his "risk profile" and the policy, and about which USAA made no subsequent inquiry. Plaintiff also points out that in light of the alleged discrepancy between the 2004 and 2005 disclosures, USAA failed to ask sufficient questions about his neck condition. Plaintiff has submitted credible evidence that he did not act to deceive USAA. See Kay, 28 Wn.2d at 301 (requiring credible evidence to overcome the presumption of deceit). Summary judgment on this issue is DENIED.

Further, because USAA knew of Plaintiff's his neck condition at the time it issued the policy, a dispute exists as to whether it considered the condition to be material. See Levy v. N. Am. Co. For Life & Health Ins., 90 Wn.2d 847, 852 (1978) (where the plaintiff revealed his condition but not the full extent of his treatment, and the insurer "failed to pursue the matter," a question for the jury remains). Plaintiff disclosed that he had an ongoing neck condition in the MHQ, and Ms. Osborne failed to fully investigate the neck issue in her telephone call with Plaintiff. Plaintiff's expert, Tim Terry, states that there was enough evidence for USAA to have known the full extent of the condition and that it simply failed to conduct an adequate investigation. (Terry Decl. Ex. B at 2.) Moreover, USAA's

underwriting guidelines stated that an attending physician's statement and medical records should be obtained to "[c]larify a health disorder when an MHQ is insufficient" or to "verify member statements, if suspicious." (Wilner Decl. Ex. DD at 1.) Plaintiff also authorized USAA to contact his physician to follow up on his disclosures. If USAA considered this condition to be material, it should have followed its underwriting guidelines and obtained more information. Whether this information materially affected the risk assumed by USAA is for the jury to resolve. <u>Cutter & Buck, Inc. v. Genesis Ins. Co.</u>, 306 F. Supp. 2d 988, 1003 (W.D. Wash. 2004) (noting that materiality is a question for the jury). Summary judgment on this issue is DENIED.

       2.    <u>Depression</u>

     USAA charges Plaintiff with having failed to disclose a "history of depression." Plaintiff responds by attacking the existence of his depression. While Plaintiff made no disclosure of depression, there exists disputed evidence as to whether he was ever treated for depression—the only question he was required to answer. (Wackerbarth Decl. Ex. E at 1.)

     USAA states that it relied on only two documents to conclude that Plaintiff had an unrevealed history of depression: (1) a March 2, 2001 letter from Dr. Daniel Melber to Dr. Kane and (2) Dr. Kane's June 1, 2001 notes. (Monica Murray Dep. at 42.) First, in his letter, Dr. Melber states that Plaintiff's social history includes "depression as above." (Wilner Decl. Ex. O.) This does not show any treatment for depression, and it does not support USAA's position. Second, Dr. Kane's note from June 1, 2001 states that Plaintiff's parents took him to a psychiatrist "as they were concerned about depression and the doctor Rx'd some Tegretol." (Wilner Decl. Ex. P at 1.) Although Dr. Kane assessed Plaintiff with "[b]ipolar disorder," he did not diagnose him with the disorder. (Kane Dep. at 60.) There is no evidence that Plaintiff ever received a diagnosis of depression at all. (Kane Dep. at 59-60.) The only fact in the record supporting USAA's position is Dr. Kane's notes that Plaintiff's self-reported he was prescribed Tegretol, a drug that may be prescribed for back and neck pain. (Wilner Decl. Ex.

T at 4.)  This is in insufficient to show Plaintiff actually received treatment for depression, given that he never had a diagnosis of depression or obtained any actual treatment.  As Plaintiff's expert, Dr. Howard Miller, explained, "lots of people might feel depressed without necessarily having the medical diagnosis of depression."  (Miller Decl. Ex. B at 2.)  The Court DENIES summary judgment on this issue.

### 3. Drug Use

USAA also denied policy benefits on the basis that Plaintiff failed to disclose his cocaine, methadone, and marijuana use.  The record does not support USAA's denial on these bases.  First, Plaintiff had no history of cocaine use.  Second, Plaintiff was not required to disclose his methadone use because it was "on the advice of a physician."  (See Wackerbarth Decl. Ex. E at 2.)   Third, a material issue of fact exists as to whether he ever took marijuana without a physician's advice and whether he used marijuana at the time he applied filled out the MHQs.  These purported omissions do not support summary judgment.

#### a. Cocaine

There is no evidence showing that Plaintiff failed to disclose any use of cocaine to USAA when he applied for insurance.  The only evidence in the record is that he died with cocaine in his body.  (Wackerbarth Decl. Ex. L at 1.)  He underwent three drug tests from USAA, in 2004 and 2005, which showed no evidence of cocaine use.  (Wilner Decl. Exs. Z, AA, CC).  USAA's 30(b)(6) deponent, Monica Murray, confirmed that there is no evidence of cocaine use, except the death certificate.  (Murray Dep. at 50, 52-53.)  USAA lacks an evidentiary basis on which to sustain its claim that Plaintiff failed to disclose his use of cocaine.  This was not a valid basis on which to deny benefits and summary judgment is DENIED on this issue.

#### b. Methadone

The evidence shows that Plaintiff only used methadone on advice of a physician.  An internal email from USAA states that Dr. Brown prescribed Plaintiff with methadone for his

back and neck pain.  (Wilner Dec. Ex. X at 3.)  Dr. Sam Cullison, USAA's expert, confirmed that "the only evidence in the record is that [Plaintiff] did use methadone on the advice of the physician in connection with pain treatment."  (Cullison Dep. at 80.)  Because Plaintiff took methadone on advice of a physician, he was not required to disclose this use based on the question asked in the MHQ.  (Wackerbarth Decl. Ex. E. at 1.)  Moreover, while Plaintiff was asked to divulge whether he was "taking medication" at the time he filled out the MHQ, there is insufficient evidence showing he was actually taking the drug in August of 2004 and 2005.  While a drug test in January 2005 shows the presence of methadone, there is no evidence that at the time he filled out the MHQ he was also taking methadone.  (Wilner Decl. Ex. CC.)  A material fact then exists as to whether he made a false statement in the first instance.  Summary judgment on this issue is DENIED.

### c.  <u>Marijuana</u>

USAA claims that Plaintiff failed to disclose his history of marijuana use.  Plaintiff argues that his marijuana use was only on advice of a physician.  The evidence shows a list of prescriptions for medical marijuana dating from March 2003 through 2004.  (Wackerbarth Decl. Ex. K.)  This supports Plaintiff's position that he never took marijuana except on advice of a physician.  However, Dr. Melber's notes show that Plaintiff admitted to using marijuana in 2001, before the 2003 prescription.  (Melber Dep. at 132.)  While this may be probative of his use of non-medical marijuana, there is a dispute over whether another prescription may have existed.  The parties agree that a fire destroyed many of Plaintiff's records, which may have contained the prescription.  (Blair Rowley Decl. ¶¶ 2-3; Murray Dep. at 16.)  Moreover, USAA's own expert admitted that "I don't think that we can make a strong case that the use of marijuana was not at the advice of a physician."  (Wilner Decl. Ex. Y.)  Whether Plaintiff should have disclosed any non-prescribed marijuana use turns on disputed factual issues.

Moreover, while Plaintiff was required to disclose any prescribed marijuana use at the time of his applications, there is nothing in the record showing he was using marijuana in

1  August of 2004 and August of 2005.  The prescriptions for medical marijuana do not refer to

2  any use at the time he filled out the MHQs.  (<u>See</u> Wackerbarth Decl. Ex. K.)  No other

3  evidence shows contemporaneous use.  Summary judgment is DENIED on this issue.

4       4.    <u>Alcoholism and migraines</u>

5       USAA contends that Plaintiff made false statements about his history of alcoholism

6  and migraines.  However, because neither of these purported conditions formed the basis of

7  USAA's denial of coverage, they do not support USAA's motion under RCW 48.18.090.

8  Moreover, disputed issues of fact remain as to whether Plaintiff had a history of alcoholism

9  and whether his disclosures about his migraines were in any way false or misleading as to a

10  material fact.  Summary judgment on these issues is DENIED.

11  D.   <u>Post-claim Underwriting</u>

12       Plaintiff argues that USAA engaged in post-claim underwriting when it used "the 20-

13  20 vision of hindsight to seek out prior health problems in order to try and defeat the claim"

14  for benefits.  <u>Uslife Credit Life Ins. Co. v. McAfee</u>, 29 Wn. App. 574, 581 (1981).  <u>Uslife</u>

15  involved a situation where the insurer denied coverage based on information not requested of

16  the plaintiffs at the time of application.  <u>Id.</u>  Here, however, Plaintiff was asked questions

17  about the medical conditions that USAA used as the basis to deny benefits.  Whether USAA

18  simply failed to follow up on these disclosures and instead relied on hindsight to defeat the

19  claim involves the same disputed issues of material fact discussed above.  Indeed, Plaintiff's

20  argument on post-claim underwriting goes to the heart of his claims against USAA that

21  cannot be resolved at summary judgment.  This serves as another reason to deny summary

22  judgment.

23  E.   <u>Motion to strike</u>

24       Plaintiff moves to strike the testimony of Michael Patterson regarding the propriety of

25  USAA's underwriting and claims handling.  The Court does not rely on Mr. Patterson's report

and therefore DENIES the motion as moot.

1

**Conclusion**

2    Disputed issues of material fact preclude a grant summary judgment in favor of

3  USAA.  A jury must determine whether Plaintiff acted with an intent to deceive USAA as to

4  his neck and back conditions and whether this materially affected the risk USAA insured.

5  Disputed facts also exist as to whether Plaintiff had any history of depression or drug use that

6  he should have disclosed to USAA.  Whether USAA engaged in post-claim underwriting is

7  yet another question to be resolved at trial.  Summary judgment is therefore DENIED.  The

8  Court DENIES the motion to strike as moot.

9    The Clerk is directed to send a copy of this order to all counsel of record.

10    DATED this 17th day of November, 2009.

11

12

13    _Marsha J. Pechman_
     Marsha J. Pechman
14    United States District Judge

15

16

17

18

19

20

21

22

23

24

25